| | EFILED Document<br>CO Boulder County District Court 20th JD<br>Filing Date: Jul 27 2005 4:25PM MDT<br>Filing ID: 6362300<br>Review Clerk: Debra Crosser |
|---|---|
| **BOULDER COUNTY DISTRICT COURT**<br>**STATE OF COLORADO**<br><br>Boulder Justice Center<br>1777 6th Street<br>Boulder, CO 80302 | |
| **Plaintiff:**<br>STEVEN SIGNER<br><br>v.<br><br>**Defendants:**<br>IRENA PIMKOVA, individually; VIDIP, LLC, a Nevada limited liability company; WILLIAM ELDER, individually; ANDREW TROJNER, individually; and JOHN DOES 1-9. | ▲ **COURT USE ONLY** ▲ |
| Russell K Bean, Esq., #15889<br>Andrew M. Schauer, Esq., #24255<br>KRYS BOYLE, P.C.<br>600 17th Street, Suite 2700S<br>Denver, Colorado 80202-5427 | **Case Number:** |
| Telephone: (303) 893-2300<br>Facsimile: (303) 893-2882<br>E-Mail: rbean@krysboyle.com<br>          aschauer@krysboyle.com | **Ctrm:** |
| **VERIFIED COMPLAINT** | |

Plaintiff Steven Signer, through his attorneys, and for his Verified Complaint against the Defendants, states and alleges as follows:

## PARTIES, JURISDICTION, AND VENUE

1. Plaintiff Steven Signer is a resident of Boulder County, Colorado.

2. Defendant Irena Pimkova is a resident of the state of California or Nevada. Her last known address is 1306 Dorothy Avenue, Unit #1, Las Vegas, Nevada, 89119. She is an officer of VIDIP, LLC, a Nevada limited liability company.

3. Defendant VIDIP, LLC is a Nevada limited liability company.

4. Defendant William Elder is a Canadian citizen. His last known address is U195-101; 1001 West Broadway, Vancouver, British Columbia, V6H4E4.

5. Defendant Andrew Trojner is a Canadian citizen. He is Managing Director of Capital Asset Management Ltd., an investment banking and merchant banking enterprise. His last known address is 310 Ridge Road West, Grimsby, Ontario, L3M4E7.

6. John Does 1 through 9 are persons, upon information and belief, who have participated or are participating with the named defendants herein.

7. The Court has jurisdiction in this action as the Plaintiff resides in Colorado, Defendants purposely availed themselves of transacting substantial business in the state of Colorado, and these causes of action arose from the consequences of those acts in Colorado.

8. Venue is proper in Boulder County pursuant to C.R.C.P. 98 because the Plaintiff resides in Boulder County and no Defendant resides in Colorado.

## GENERAL ALLEGATIONS

9. Plaintiff Signer is a registered representative of a Broker-Dealer named Bathgate Capital Partners LLC ("Bathgate"), which is based in Greenwood Village, Colorado.

10. In 2004, Defendants Elder and Pimkova contacted at least thirteen individuals and business entities, inviting them to participate in an investment opportunity. After the potential investor agreed to receive more information, Defendants Elder and Pimkova would hold a telephone conference with the potential investor. *See* Exhibit A, statement of events prepared by God's Work Foundation, Inc. Details of the false representations of Elder and Pimkova to investors as set forth in the following allegations are contained in Exhibit A.

11. Defendants Elder and Pimkova told potential investors that they would set up a trading account with a brokerage firm in the investor's name in order to invest in U.S. Treasury bonds. The brokerage firm, they added, was able to buy U.S. Treasury bonds at a discounted rate, and thereby was able to create higher rates of return. They told the potential investors that their investment opportunity was only offered to wealthy individuals or groups, and that the potential investor would have to open an account with $1,000,000, minimum.

12. Defendant Elder stated to potential investors that the money invested would be placed into a non-depletion account at PNC Bank and that the account would have at all times $1,000,000 comprised of cash and U.S. Treasury bonds.

13. Defendant Elder stated that there was no chance of loss on the principal investment. Defendant Pimkova assured the potential investors that several of her clients had made one hundred percent of their original investment.

2

14. Pimkova told potential investors that she was secretary to Mr. Peter Wolfgang Bachmann, whom she stated was a director of the brokerage firm offering the investment opportunity.

15. Ms. Pimkova told each investor that she would not reveal to the investor the name of the brokerage firm until they had committed to participate in the investment plan and had executed documents that she prepared. Defendants Elder and Pimkova acted under the guise of representing the brokerage firm.

16. Pimkova and/or Elder required each investor "invited" to participate in the program to sign an agreement with Pimkova's company, VIDIP, LLC and/or Elder and his company, World Vision. The agreement mandated that the investor pay to VIDIP, LLC and/or Elder eight percent of all profits earned from the investment. This payment was due each quarter, and would continue to be due so long as the investor remained in the program and had an account with the brokerage firm she had selected.

17. Defendant Pimkova prepared documents with each investor, and provided guidance when necessary. The following is a list of documents Plaintiff understands was provided to each investor:

   a. An instruction form;

   b. A blank account application, which did not include the name of the brokerage firm Pimkova and Elder selected;

   c. IRS form W-9;

   d. Corporate Resolution/Certificate of Corporate Secretary/Brokerage Account and Trading Resolutions;

   e. Limited Training Authorization Form—Trading Authorization Limited to Cash/Margin Purchase and Sales of Securities;

   f. General Advisory Agreement;

   g. Customer Agreement; and

   h. Customer Margin Agreement.

These forms did not include the name of a brokerage firm, and no indication was given as to whom these documents would be submitted, although some of the forms referenced Fiserv Securities, Inc.

18.     Upon receipt of the executed forms, Pimkova and Elder would only then reveal to investors that they chose Bathgate as the brokerage firm, and that Signer would service the account.

19.     Signer serviced the investors' accounts, but he did not know about the agreements Defendants Pimkova and Elder made with the investors, nor did he know how those investors were solicited, and in spite of numerous requests Signer was not furnished with executed copies of those agreements.

20.     Signer informed at least one investor upon inquiry that he did not know Defendants Elder, Pimkova or VIDIP, LLC, and that they did not have any relationship to him or Bathgate.

21.     Some investors began to suffer losses on their investments. Upon finding that they were not receiving their eight percent commission, Defendant Elder sent written correspondence to at least one investor to request that the investor pay all fees due to Defendants Elder, Pimkova and VIDP, LLC. Upon the account of one investor, this letter was the first correspondence sent by Defendants after submitting the forms to set up the investment accounts. *See* Exhibit A.

22.     When Defendants found that they were not receiving the fees they anticipated, Defendant Pimkova then began stating to others that Signer was negatively trading treasury bonds. *Id.* She also stated to others that Signer was a criminal, a thief and a dishonest man who stole money from "her clients." *See* Statement of John Wesley Hardin, attached hereto as Exhibit B.

23.     When investors began to question Pimkova and Elder about the investment opportunity, Pimkova stated to investors that she, too, was an investor with Bathgate, and that she also had lost money. She reassured the investors that she was affiliated with Bathgate, and asked that the investors provide their statements so that she could address the issue with Bathgate. When an investor asked Pimkova to provide her statements, Pimkova refused, and stated that she had signed confidentiality agreements, and that in her position she was not permitted to address the investor's concerns over the telephone, and she could not disclose the name of the Bathgate director with whom she was affiliated. *See* Exhibit A.

24.     Defendants Pimkova and Elder stated to at least one investor that Pimkova had been threatened by Bathgate and Signer, and were trying to coerce Pimkova into signing an agreement against her will. Pimkova urged the investor to hire an attorney and file a class action lawsuit against Bathgate. *See* Exhibit A.

25.     Defendant Trojner contacted several people by e-mail and stated to them that Signer and Bathgate manipulated the Investors' funds and "traded them down" in an attempt to steal those investors' money, and that Bathgate was changing auditors and trying to sell the

4

brokerage firm in an attempt to conceal the theft. *See* E-mail correspondence drafted by Trojner attached hereto as <u>Exhibit C</u>.

26. Defendant Pimkova stated to at least one other person that she wanted to cause permanent damage to Signer, his family and his associates in all levels of life. She stated that she wanted Signer to "remain in the country in captivity," that her "people" would do damage to Signer on all levels for $5,000.00 and take an "additional percentage" of the money she believed belonged to her. *See* <u>Exhibit B</u>.

## FIRST CLAIM FOR RELIEF
### (Defamation)

27. Plaintiff hereby incorporates paragraphs 1 through 26 as if fully set forth herein.

28. Defendants Pimkova and Elder published and caused to be published statements specifically about Plaintiff as set forth above in the same or substantially similar words. These statements held Plaintiff up to contempt or ridicule, harmed Plaintiff's reputation and are false.

29. Defendant Trojner published statements specifically about Plaintiff which caused harm to his reputation and are false.

30. The statements of Defendants Pimkova, Elder and Trojner alleged that Plaintiff engaged in criminal and unethical activities.

31. Defendants made the statements as set forth in paragraphs 22-26 above with malice and intent to injure Plaintiff.

32. The statements made in paragraphs 22-26 above are defamatory *per se*.

33. As a result of Defendants' actions, Plaintiff suffered injuries both economic and otherwise.

WHEREFORE, Plaintiff seeks the relief set forth below.

## SECOND CLAIM FOR RELIEF
### (Intentional Interference with Contractual Relations)

34. Plaintiff hereby incorporates paragraphs 1 through 33 as if fully set forth herein.

35. Plaintiff had contracts with investors, and Defendants knew of those contracts.

36. Defendants have intentionally and improperly interfered with Plaintiff's actual and existing business relations with his customers.

5

37.     Defendants' acts have caused Plaintiff injury, emotional distress and economic loss.

WHEREFORE, Plaintiff seeks the relief set forth below.

### THIRD CLAIM FOR RELIEF
### (Violation of the Colorado Organized Crime Control Act, C.R.S. § 18-17-101, *et seq.*)

38.     Plaintiff hereby incorporates paragraphs 1 through 37 as if fully set forth herein.

39.     Pimkova committed fraud and attempted to commit, solicit, coerce or intimidate another person to commit murder, assault or kidnapping.

40.     Pimkova, VIDIP, LLC and Elder knowingly and intentionally engaged in a pattern of racketeering activity individually and as a joint enterprise.

41.     Defendants Pimkova, Elder and VIDIP, LLC have caused injury to Plaintiff and other third parties through their unlawful acts.

WHEREFORE, Plaintiff seeks the relief set forth below.

### FOURTH CLAIM FOR RELIEF
### (Violation of the Colorado Consumer Protection Act, C.R.S. § 6-1-101, *et seq.*)

42.     Plaintiff hereby incorporates paragraphs 1 through 41 as if fully set forth herein.

43.     Defendants Pimkova, VIDIP, LLC and Elder engaged in deceptive trade practices when they knowingly made false representations as to the nature of their affiliation and connection with Signer and Bathgate.

44.     Defendants Pimkova, VIDIP, LLC and Elder engaged in deceptive trade practices when they knowingly made false representations as to the characteristics and benefits of the investment opportunity they offered to the investors they brought to Bathgate.

45.     Defendants' deceptive trade practices as set forth above occurred in the course of Defendants' business.

46.     Defendants' deceptive trace practices as set forth above significantly impact the public as potential or actual consumers of their services.

47.     Plaintiff suffered injury in fact due to the Defendants' unlawful acts.

WHEREFORE, Plaintiff Steven Signer respectfully requests that:

(a) Judgment be entered in favor of Plaintiff;

(b) this Court award to Plaintiff all reasonable damages, costs, expert witness fees and attorney's fees suffered by Plaintiff as a result of Defendants' unlawful conduct, including punitive damages;

(c) Defendants Pimkova, Elder and VIDIP, LLC be divested of any interest in any enterprise as defined by C.R.S. § 8-17-103;

(d) this Court enjoin violations of provisions of C.R.S. § 18-17-104 by issuing appropriate orders and judgments, including a temporary restraining order and preliminary injunction;

(e) enjoin Defendants from publishing statements about Plaintiff which are false, specifically that Plaintiff is a criminal, is stealing investors' money, and is engaging in negative trading to steal the investors' money, including a temporary restraining order and preliminary injunction;

(f) this Court award to Plaintiff a money judgment of forfeiture for the amount of proceeds derived from activities prohibited by C.R.S. § 18-17-104;

(g) this Court award Plaintiff damages for emotional distress;

(h) treble damages pursuant to C.R.S. § 6-1-113;

(i) the Court award such other and further relief in favor of Plaintiff as is just and equitable.

Respectfully submitted this __27__ day of __July__, 2005.

KRYS BOYLE, P.C.

_____
Russell K Bean
Andrew M. Schauer
600 17th Street, Suite 2700 South
Denver, CO 80202

Plaintiff's Address:   Due to the threats made against Plaintiff by Defendant Pimkova, Plaintiff does not disclose his home address at this time.

He may be found at Bathgate Capital Partners, LLC, at 5350 S. Roslyn Street, Ste. 400, Greenwood Village, Colorado, 80111.

## VERIFICATION

I hereby verify that the facts set forth in the foregoing Verified Complaint are true and accurate.

*/s/ Steven Signer*

Steven Signer

## EXHIBIT I

The Exhibit to this letter provides significant chronological events and facts that are in part the basis of alleging improper conduct on the part of Mr. Steven Signer and Bathgate Capital Partners...et al. Furthermore, the following parties who claim affiliation to Bathgate Capital are (Mr. Peter Wolfgang Bachmann- supposedly a director of Bathgate/Fiserv, Irena Pimkova CSc-Secretary to Director Bachmann, and William Elder, authorized agent to Bathgate/Fiserv). These individuals are the primary parties who were instrumental in contacting/soliciting and providing the trading program offered and *"all"* Bathgate/Fiserv documentation directly to GWFI for signature in the "trading program" through *their exclusive connection/relationship* to Bathgate Capital Partners (the brokerage company) and Fiserv (the brokerage firms accounting and record keeping affiliation), as well as PNC Bank instructing GWFI with account information for wiring $1 million dollars. **No** documentation in GWFI's file at Bathgate Capital Partners was **ever provided by Bathgate** with the exception of the "Truth in Lending Statement" that Steven Signer submitted directly to GWFI only after questioning him directly about losses in GWFI's account noted in the monthly statements and disposition of the account, several months later.

Furthermore, the named parties stipulated that PNC bank had legal capacity out of a handful of authorized U.S. Banking Institutions to provide "new account holders" *willing* to deposit the minimum requirement of $1M with a 10 to 1 margin in monetary value in purchasing Treasuries Bills/Bonds specifically for the Bathgate Trading Program. In other words, GWFI's deposit of $1M guaranteed that GWFI would receive 10x's the leverage or $10M in Treasuries for *trading purposes only* in Bathgate Capital Partners Program. In addition, that such investments wired to PNC Bank were fully insured for 4.5x's the deposit amount, and that the new account held at PNC would be in a sole signatory, non-depletion account with no risk of loss of principal. These parties (including Steven Signer) further stated each account/deposit had added protection by Fiserv of up to $100M per account, and insurance through the SIPC, to which Bathgate and Fiserv are members, should any losses occur without stipulation of what was meant by losses or covered by insurance.

### Chronological Events:

1. April-May 2004- God's Work Foundation, Inc. a 501 (c) 3 nonprofit organization was contacted by Mr. William Elder (Canada) and Ms. Irene Pimkova CSc, Los Angeles\Las Vegas, regarding an investment opportunity, that was submitted to GWFI as the investment program.

2. After receipt of program offered, a teleconference call was initiated by Elder & Pimkova to GWFI, in which Pimkova\Elder stated that the account "they" would set up for GWFI was especially connected to that of a Director of the Brokerage Firm, and that this U.S. Treasury program was offered by invitation only to wealthy Individuals and/or groups such as GWFI. That it was an exclusive opportunity that was only available through Ms. Pimkova, and placement of $1M USD was the minimum investment allowed for participation.

3. Mr. Elder reiterated that the investment or use of GWFI's capital would be in a sole signatory account at PNC Bank under the name of GWFI, and not placed in a sub-account. That the principal capital would be used to purchase U.S. Treasury Bills\Bonds\Notes, and that PNC Bank was one of only a select few that would allow the funds deposited to be leveraged by the bank in buying power at a rate of 10 to 1 with no chance of loss of the principal investment. That GWFI's account at all times would have either $1M in Treasury Bills\Bonds or notes and/or cash in the account. Ms. Pimkova backed up his statements and added that several of her clients in the program had made "great profits" 100% of their principal investment and the program had been trading for a number of years successfully.

4. Ms. Pimkova also advised that she was the secretary for a Director of the Brokerage firm named Mr. Wolfgang, and that she was not at liberty to discuss the name of the brokerage firm until GWFI were to agree to participate in the program. In addition GWFI had to provide her "Proof of capability" from GWFI's bank statements of clean/clear funds valued at $1M or greater, before the invitation to participate in this exclusive program would be honored by her and the director. After proof of funds was submitted, and GWFI was officially invited, she stated

EXHIBIT A

that "she was in charge of sending the brokerage firm documents". That only upon GWFI executing all brokerage documents would GWFI learn the name of the Brokerage Firm handling the program.

5. GWFI was mandated to sign an additional agreement with Ms. Pimkova's company called VIDIP, LLC a Nevada limited Liability Company, prior to placing GWFI into this "exclusive program." GWFI had to agree to pay VIDIP, LLC a fee of 8% from all profits earned on the investment. The payment was due each quarter and would continue to be due for as long as GWFI remained in the program and had an open account with the brokerage firm. This fee was non-negotiable as it was payment to VIDIP, LLC for soliciting investors into the program for the brokerage firm.

6. GWFI submitted bank records showing proof of funds for $1M on deposit to Ms. Pimkova per her requirements. Ms. Pimkova then advised GWFI it had been approved as a qualified participant in this exclusive U.S. Treasury Trading Program. She sent via express mail service the following brokerage documents:

    1.) Instructions
    2.) Blank Account Application- No name listed on the account application as to the name of the brokerage firm that GWFI was being asked to fill out.
    3.) IRS Form W-9 Request for Taxpayer Identification Number and Certification
    4.) Corporate Resolution/Certificate of Corporate Secretary/Brokerage Account and Trading Resolutions. This document stated Fiserv Securities, Inc. Note not knowing which trading activity was part of the "exclusive program" GWFI left all three sections unchecked. Also, not knowing which section to sign on page 2, or to disregard either section in the box, GWFI was advised by Ms. Pimkova to sign "For margin transaction approval only".
    5.) Limited Trading Authorization Form- Trading Authorization limited to Cash\Margin purchase and sales of securities. This document was sent to GWFI completely blank, did not name to whom this authorization was being given to by GWFI, but was mandated by Ms. Pimkova as necessary to enter into the "exclusive program". No brokerage firm name listed on the document. Mr. Robert Milton signed on behalf of GWFI as it's President and had the signature notarized on June 23, 2004.
    6.) General Advisory Agreement- no name as to rather this document was for Bathgate or Fiserv.
    7.) Customer Agreement- This document was preaddressed to Brokerage Services and appeared to be a form belonging to Fiserv Securities, Inc. (the font is so small, 6 point or less) that it was impossible to read!
    8.) Customer Margin Agreement- Also preaddressed to Fiserv Securities, Inc. (font again extremely small to read). Having only received documents listing Fiserv Securities, Inc. GWFI thought the brokerage firm was with Fiserv. On page 2 under number 15 a blank line is provided for naming the broker in charge of transactions for GWFI. Not allowed the name of a broker, GWFI could not fill in the blank.

7. GWFI sent each of the above documents for the "exclusive program" offered by Pimkova\Elder back to Ms. Pimkova per her written instructions. Upon receipt and review of GWFI's executed documents, Ms. Pimkova finally disclosed the name of the brokerage firm as being Bathgate Capital Partners. Having executed customer and margin agreements that stated Fiserv Securities, Inc., GWFI asked how that firm was involved in this program and why the forms GWFI executed were only with Fiserv rather than Bathgate. Ms. Pimkova advised that FSI provides processing and support services to securities brokerage affiliates of banks and other financial institutions and broker-dealers. That this firm provides accounting services to Bathgate and sends out the monthly statements for Bathgate to their clients.

8. Ms. Pimkova contacted GWFI on June 27, 2004 stating that she had transmitted all of GWFI's executed documents to the Brokerage Firm at Bathgate and the broker assigned to GWFI's account was a broker by the name of Steven Signer. She then advised that Mr. Signer had contacted her about an error GWFI had made when filling out the account application. Under the section heading of Customer Suitability-Risk Tolerance, GWFI had marked Stable Capital Preservation or low risk, as Elder\Pimkova had advised in their discussions and in the document received by GWFI, that the principal investment was 100% secure at all times, thus no chance of lose. Ms. Pimkova advised that Mr. Signer could not begin to trade in GWFI's account until the risk tolerance section was marked "Very High\Speculative" for this exclusive program.

12

9. Prior to agreeing to any changes, Mr. Milton the President of GWFI insisted on speaking directly with his assigned broker, Mr. Signer. Ms. Pimkova provided the phone number to Mr. Signer and a call was made by Mr. Milton to Bathgate Capital Partners who asked for Mr. Signer. Upon speaking with Mr. Signer, he was advised that Mr. Signer had received all of GWFI's paperwork.   Mr. Milton inquired of Mr. Signer about the investment risk in this program and explained to Mr. Signer that Ms. Pimkova had stipulated that there was no risk of loss. Mr. Signer advised Mr. Milton that some of his investors had actually made 100% in profits per year, but a more realistic or average figure was 20 to 30% per year. He further stated that no one under his control ever lost there capital. He indicated that GWFI should leave these decisions "entirely up to him, aided by his advisory staff that routinely met every day, and that those clients that try to "direct traffic" in regard to purchase and sales in their accounts are the ones that fail to make a profit"!  Therefore, GWFI justifiably agreed to allow him control over the account and relied to its detriment on the statements Mr. Signer made. Believing him, GWFI agreed to wire $1M to the bank designation provided by Mr. Signer/Ms. Pimkova at PNC Bank and authorized him to initiate trades.

    Mr. Signer sent an email on June 29, 2004 stating he was pleased to inform GWFI that an account #13064319 in the name of God's Work Foundation, Inc. at Fiserv Securities, Inc. was opened, and that Fiserv insures every account, SIPC insurance to $100,000,000. He also provided wiring information to PNC bank.  GWFI wired $1M to PNC bank and on July 1, 2004 received another email message from Mr. Signer that the wire had been received. Mr. Milton was also given access and details of tracking his account through Bathgate's website through a personal password. The first week or two from opening the account showed that the account had gained about 20%. From that point on the account began to slide dramatically.

10. Mr. Milton in early July 2004 accessed the GWFI account on Bathgate's website and found it to be confusion. He then asked Mr. Signer for a glossary of terms to understand the meanings listed in his account, and was promised by Mr. Signer that he would provide such materials. As of July 2005, Mr. Signer has never complied with this request. However, upon requesting help with understanding the account information, Mr. Signer did state that the web page was in the process of being changed to make it more understandable and "more truthful". Also, he advised that as an investor GWFI would receive a monthly newsletter, and no such newsletter was ever provided. In fact the only newsletter on Bathgate's Website is two years old. As losses appeared to be occurring in mid-late July 2004 from what the website account showed, Mr. Signer was routinely contacted by GWFI. Upon inquiring about such losses, Mr. Signer stated that the loss of value in the account noted by Mr. Milton were "not true" and that he should ignore the postings. Shortly after that period and from time to time, GWFI began to receive notices both on the website and letters from the compliance department at Bathgate, that maintenance calls were due and additional deposits of money were imminently necessary to save the account from liquidation events of GWFI's securities. Upon receipt of each letter or notification on the account via the website, Mr. Milton immediate contacted Mr. Signer every time. When questioned Mr. Signer again and again he stated that these notices (even those from his own companies compliance department) were not accurate, the account was safe, not losing money, the principal was safe and intact and to "ignore" these notices. Over a 6 or 7-month period there were approximately 6 letters regarding maintenance calls and possible liquidation events.

11. From August to November 2004 the account appeared to be sliding further and further. In December 2004 after having tried to speak with Mr. Signer for *nearly two weeks* having left several messages and emails, Mr. Signer finally called back apologizing that he was out of town thus could not get back to GWFI before now. Being extremely distressed that the account balance appeared to show only a value of $500,000 GWFI advised Mr. Signer that he had sent him an email with instructions to take GWFI out of the investment program, and to preserve as much of the investment capital as possible. That GWFI needed to abandon investing and close the account with Bathgate if there was ***any chance*** the account and GWFI would lose all of its money, and to return the remaining capital to GWFI's bank account in Redding California. Mr. Signer e-mailed that he would do this. Then, as usual, Mr. Signer again assured Mr. Milton that the website page was wrong, and not to worry, that the principal funds in the account were safe and that there would not be any overall losses or liquidation events.

13

12. In January 2005, GWFI contacted Mr. Signer advising him that GWFI required $50,000 from its Bathgate account to cover expenses and obligations of GWFI since the expected profits of 20 to 30% a year or more had not come to fruition in the investment program as promised. Although Mr. Signer stated that he would make sure the $50K was sent to GWFI in a few days, it took weeks to receive. In continued concerns about the investment program and the lack of care or concern regarding the account by Mr. Signer, who was notorious for not returning emails or phone calls for days, and often weeks, GWFI wanted some answers in writing from Mr. Signer and Bathgate Capital Partners. On February 14, 2005 GWFI drafted a letter to Mr. Signer requesting specific answers to questions in writing. Mr. Signer did not respond to the letter or call GWFI. GWFI in the meantime received another maintenance call letter from Ms. Ross and not having heard back from Mr. Signer, drafted a letter specifically to Ms. Ross dated February 27, 2005. Ms. Ross, as well as Mr. Signer, chose not to respond to that letter. The only time the compliance department acknowledged GWFI was in a request to Ms. Ross asking for a copy of all documents on file at Bathgate for GWFI since GWFI had never received any signed documents back from Mr. Signer that had been blankly executed by GWFI with Ms. Pimkova. GWFI found the documents in its file to be very interesting and disturbing. However for the sake of using these documents as exhibits for our case, we will not share with you the discrepancies noted at this time.

13. Finally, perhaps at the urging of Ms. Ross, Mr. Signer drafted a letter to GWFI dated February 24, 2005 which was received by GWFI on February 26th. For the most part it did not address one single question raised by GWFI. And in fact the statements that Mr. Signer did make in this correspondence were completely false. However, he did state that all messages to and from GWFI at Bathgate were recorded and preserved thus he could retrieve those recordings rather than getting into a "I said/ you said" about what he had been advising GWFI over the last several months. **_For the record, GWFI is requesting and would appreciate receipt of all taped voice messages/conversations that took place with GWFI and Mr. Signer at Bathgate if they actually exist starting on June 27th, 2004 up to July 5th, 2005._** Given the fact that Mr. Signer was never at the office when GWFI called him, we have doubts that he was at the office when he returned our calls and most likely called GWFI from his cell phone, thus voice recordings probably do not exist as he claims.

14. In March 2005 (early part) Mr. Signer left GWFI a phone message insisting that Mr. Milton deposit $20,000 into the account at Bathgate to cover expenses of some type. Upon receipt of that message Mr. Milton contacted Mr. Signer to advise him that GWFI, as he very well knew from previous and recent conversations, that GWFI did not have any more money, which was the reason for asking for the return of $50K to GWFI from the Bathgate account a few weeks earlier. Mr. Signer stated he would do what he could to save GWFI's positions with Fiserv.

15. Approximately March 2005, Mr. Signer knowing the nature of GWFI's 501 (c) 3 nonprofit, advised that he had a very wealthy investor who was also a client, that he would speak to Mr. Hans Becker about donating money to GWFI. He stated he would arrange for Mr. Milton to meet with this individual and possibly others to arrange their giving of gifts to GWFI. No such meetings or contact with wealthy investors took place.

16. From March 2005 to May 2005, several communications (all of which were initiated by GWFI) continued to take place whereby Mr. Signer stated he was planning to continue to arrange for his wealthy investors/clients to meet with GWFI to donate money. GWFI has several emails to this effect, and as usual, Mr. Signer continued to make excuses for never being available either always out of the office or town, or whatever to justify the continued lack of communication in a timely manner. In almost every single written communication drafted by Mr. Signer it starts out with why he did not get back to GWFI. However, several emails in May 2005 state that he would attempt to layout his plan to bring GWFI's account to health again, and as usual no actual plans ever materialized.

17. On June 11, 2005 for the first time, Mr. Signer actually sent GWFI an email laying out a two-part plan. While _ludicrous_, according to other experts with whom GWFI has shared this letter, Mr. Signer at least sent something in trying to explain away the problems in the market, relying on comments made by Alan Greenspan to the Senate Committee and how to bring GWFI to a cash position, then to get wealthy investors to donate to GWFI and for GWFI to agree to deposit half of such donations back to its account at Bathgate. That in so doing, his plan could actually bring GWFI back to $1M or perhaps up to $2 to $3 million on the bond.

14

18. May 2005 an email was sent to GWFI from William Elder asking why the 8% commission/fee had not been paid to him, Ms. Pimkova and VIDIP, LLC. GWFI contacted Mr. Elder and Ms. Pimkova (who by the way had not contacted GWFI since setting up the account with Bathgate and our wiring $1M), advising them that GWFI had approximately $6,000 left out of the investment. Ms. Pimkova insisted that GWFI was ignorant when it came to understanding and reading the monthly reports sent by Fiserv and insisted that GWFI send her a copy of the monthly statements. GWFI, now working with a financial advisor and business partner on this matter, contacted the advisor, Mr. Maxwell, to advise him what Mr. Elder and Ms. Pimkova were asking GWFI to do. Mr. Maxwell insisted that no documents to these parties be provided until they agreed to have a conference call with Mr. Maxwell on the line. This took place that same evening.

Mr. Maxwell advised Ms. Pimkova that he certainly knew how to read such statements and in fact GWFI's account had only $6K plus change remaining out of its investment of $1M. Mr. Maxwell also advised her that Mr. Signer on several occasions repeatedly denied knowing her or Mr. Elder and that Mr. Signer had advised GWFI that neither one of them had any relationship to Bathgate/Fiserv. Ms. Pimkova became outraged and stated that Mr. Signer knows her very well and in fact, she too was an investor with Bathgate, and has also lost money just like all the many other investors she had placed in the program. She again stipulated that she was connected with a Director of Bathgate and that she was asking all investors to provide her with their monthly statements so that she would meet with this individual and try to straighten this matter out to everyone's satisfaction.

Mr. Maxwell asked her to go first, and to please provide her (Pimkova's), monthly statements from Fiserv to GWFI "as a quid pro quo" since she was claiming to be an investor and asking GWFI to comply with providing her this information. However, she flatly refused stating she had signed confidentiality agreements and in her position was not able to answer our questions over the phone as to each of items we raised, including the name of this "director". While extremely skeptical, GWFI did agree to send over a copy of its monthly statements. She agreed to keep GWFI informed as to the disposition of the meetings with Bathgate and others she supposedly had a connection too, and would contact GWFI within a matter of days. No such contact took place.

Approximately two weeks went by and a call was placed to William Elder. Mr. Elder stated that Ms. Pimkova was at the second meeting with Bathgate and its directors among other parties, and would be returning within a day. Approximately three days later GWFI received a phone call from Ms. Pimkova and Mr. Elder, and she advised that she was _unable to reason with Bathgate and its directors_ and that she was advising all the investors she brought into Bathgate to hire an attorney and file a class action suit. She also stated that _she had been threatened by Mr. Steven Bathgate, and Mr. Signer_ and that both these individuals were trying to scare her into signing some type of agreement.

GWFI stated that as far as we were concerned, she was just as responsible for misconduct as Mr. Signer and Bathgate and GWFI intended to seek all remedies against all parties including her and Mr. Elder and Bachmann from the authorities. That if she were to cooperate and we recommended that she do so right now as a matter of good faith, she could start by providing GWFI with the list of names of all investors that _she placed_ in the Bathgate program who lost money. She quickly provided a list with 11 names, addresses, email addresses and phone numbers. GWFI immediately made contact with each of the individuals listed and found that 9 are investors with Bathgate, each having lost almost all their money with one investor having lost over $26M out of his investment of $30 Million. Each has written back on what took place with them in their accounts, and who was involved. Mr. Signer is the broker of record for each of the investors on the list and everyone's story and understanding regarding RISK is the same as that of GWFI.

While there are many other details that GWFI is not prepared to divulge to Bathgate at the present time, this outline and chronological order is fairly comprehensive and an "accurate" assessment regarding the parties responsible for the loss of nearly $1M in GWFI's capital. *Note:* Refer to the Addendum attached as it contains additional information and a partial basis as to why GWFI is alleging misconduct.

15

①

# John Wesley Hardin

335 Samson Trail
McCall  Idaho


Attention:   Mr. Steve Signer
Subject:     Contact and communication with Miss Irene Pimkova

This Declaration is made and entered into effective the day of June 29th of 2005 voluntarily with no outside influence.

I, John Wesley Hardin, "Witness" to multiple events unfolding and currently developing. From April 2004 to June 2005 in reference to Mr. Steve Signer and Miss Irene Pimkova "she expects to be called Dr. Irene" to execute this affidavit.

I, John Wesley Hardin accept all personal and legal responsibility under penalty of perjury from the Magisterial Courts, in the proper jurisdiction. This "Statement of Fact" is subject to the jurisdiction of such court for resolve.

My "Statement of Fact" is as follows:

I met Miss Pimkova around April 2004 at the private residence of Mr. Peter Bachmann in Arizona USA. All contact and communication I had with Miss Pimkova has been social and "non business". My appearance at Mr. Bachmann's residence is based on family friendship. There are two exceptions when I had been approached by Miss Pimkova directly and intense. On or about "May 8th 2005 and June the 1st 2005".

The contact and the communication on these two days with Miss Pimkova I was surprised. I had not expected, neither scheduled nor planned the "8th of May 2005" and "June 1st 2005". These two (2) events and the subject matter are completely different than any and all other contact and communication prior to these dates "8th of May 2005" and "June 1st 2005" with Miss Pimkova.

On or about "8th of May 2005" Miss Pimkova insisted to tell me about her present concern and situation in reference to Mr. Steve Signer and Bathgate Capital Partners.

I have never heard about the existence of Mr. Signer and Bathgate Capital, I had never contacted nor communicated with Mr. Signer nor his firm before Miss Pimkova expressed her anger, rage and negativity directed toward Mr. Signer. I have never seen or experienced behavior like this before, with any contact and communication with Miss Pimkova.

Miss Pimkova laid out in a very angry way her frustration and intent toward Mr. Signer.

Miss Pimkova named verbally Mr. Signer a criminal, thief and dishonest man who has stolen the money from her clients and refused to pay her commission, her expenses, referral fees for her efforts and hard work for making all these deals happen.


EXHIBIT B

②

I attempted several times to change the subject without any success; Miss Pimkova ignored my objection totally and continued even angrier with her presentation. I had to listen to a bombardment of accusations and hearsay in a subject I have no knowledge or interest in. Miss Pimkova become more and more exited in an aggressive way of expression. Miss Pimkova conduct continued for several hours, with her repeating herself in this subject matter, and most of the time Miss Pimkova was talking.

The second event and or about "June 1st 2005" is very different from the one before. Miss Pimkova appeared very aggressive and again very demanding and I listen to her story and ideas and I was very surprised again. After she had released a part of her anger, she became very specific on her intentions of revenge. On her own merit she stated to me, that she has been highly trained by the KGB, that she has made eight (8) doctor titles, and "her background people" she has access to, can do and will do anything what is needed on any level to resolve this Signer and Bathgate problem.

However Miss Pimkova stated further she needs someone active in the Signer matter very soon. Miss Pimkova said; "I must prevent Mr. Signer from leaving the country with the money he has stolen". Miss Pimkova wanted me to give her specific ideas on how to keep Mr. Signer from leaving the USA, and "cause permanent damage" to him, his family and his associates in all levels of life. Also Miss Pimkova urged me to give her ideas how I am able to recover and repossess the money that was stolen by Mr. Signer. "Mr. Signer should remain in the country under captivity". These questions came up all the time; she was repeating her demand constantly in a very pushing fashion. During her very aggressive monolog she stated that "her people" will do damage to Mr. Signer on all levels for USD$5.000, – and take an additional percentage back from the recovery of the stolen money through Mr. Signer.  ②

At this point in the conversation Miss Pimkova demanded specifically from me to give her a timeline when to get active, work profile and costs including cash advance or operating costs to accomplish this task, and how much time it will take in total.

Miss Pimkova focused on this issue for over one hour, it seemed to be very significant to her.

I have no idea why Miss Pimkova questioned me on this subject of damaging Mr. Signer. However this is a very serious event with legitimate intent. My expertise is engaging in safety, personal protection, recovery and productivity.

My opinion at this time is that Mr. Signer is marked by Miss Pimkova and "her people" to do permanent damage at any level, including physical.

It is my own choice to inform Mr. Signer of this information as I have received it, during the contacts and communications with Miss Pimkova.


_John Wesley Hardin_ (WH)
John Wesley Hardin
Dated: June 29, 2005

| | |
|---|---|
| **From:** | freeandrich@sympatico.ca |
| **Sent:** | Monday, June 13, 2005 6:17 AM |
| **To:** | |
| **Cc:** | |

**Subject:**

Dear Members,

This is very important, so please respond. We are the original 13 members who funded a program with William Elder, Dr. Pimkova throught Peter Bachmann to Bathgate.

They have run our accounts down and are trying to steal the money. They are planning to move to another auditing firm to avoid reporting the transactions that have occurred. They are already being sued by a major U.S. corporation and I have made contact with that lawyer to handle our case as we have some information that will help our case.

I need a few things.
1) A detailed account of what happened with your funds and an account of correspondence with Signer or anyone at Bathgate.

2) Details of what the returns were to be. I was told 20% a month. I was paid 20% in interest in the month of June, 2004 which represented my May transactions. This set the precedence and will help us with our suit.

3) I need you to contact the FBI and launch an investigation against Bathgate, Steve Signer, Richard Huebner, Steven Bathgate, Susan Ross, Peter Bachmann.

We have to do this to prevent the sale of Bathgate to another corporation. Yes, they are trying to sell the company and we will all lose when this happens.

You may have some negative feelings towards William Elder and Dr. Pimkova. I did as well. However, they did not manipulate our funds, nor did they trade them down. That was Bathgate and Signer. I do not know if it is in our interest to go after them at this point. They are able to give us some inside information that will help us win. Also, Dr. Pimkova is in the same position as we are. She also lost her money.

I will work for you and with you to get our money back. My goal is to get 300% of our principle back.

Please respond and go to the FBI and police today.

Sincerely,
Andrew Trojner
Managing Director
Capital Asset Management Ltd.

1



EXHIBIT
C